## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FRIENDS OF THE BOUNDARY WATERS WILDERNESS,<br><br>         Plaintiff,<br><br>    v.<br><br>BUREAU OF LAND MANAGEMENT; MITCH LEVERETT, Bureau of Land Management Eastern States Acting State Director; JOSEPH R. BALASH, Assistant Secretary, Land and Mineral Management, U.S. Department of the Interior; DANIEL H. JORJANI, Principal Deputy Solicitor, U.S. Department of the Interior; U.S. DEPARTMENT OF THE INTERIOR; RYAN ZINKE, Secretary, U.S. Department of the Interior; and UNITED STATES OF AMERICA.<br><br>         Defendants. | Civil Action No.<br><br>**COMPLAINT** |

Plaintiff Friends of the Boundary Waters Wilderness ("Friends"), for its Complaint against Defendants, alleges as follows:

### INTRODUCTION AND NATURE OF THE ACTION

1.      This is an action under the Administrative Procedure Act and Declaratory Judgment Act challenging the Federal Government's unlawful resurrection of two expired copper-nickel mining leases owned by Twin Metals Minnesota ("Twin Metals") on lands nearby and adjacent to the Boundary Waters Canoe Area Wilderness ("BWCAW"), a 1.1 million acre iconic, water-rich wilderness area in northern Minnesota protected by federal law for over 100 years. Twin Metals proposes a

sulfide-ore copper-nickel mine on these lands just miles from—and directly upstream of—the BWCAW.

2.     On December 16, 2016, the Bureau of Land Management ("BLM") cancelled the Leases in a final agency action. This determination was based on a well-reasoned opinion of the Solicitor of the Department of the Interior that Twin Metals was not entitled to renewal as of right, as well as a decision of United States Forest Service, pursuant to its statutory authority and its authority under the leases, to not consent to the lease renewal due to the inherent risk of environmental damage to the BWCAW. In the final agency action, BLM informed Twin Metals that its Leases would not be renewed, and the Leases expired.

3.     Over one year later (16 months), BLM revived the Leases under the guise that there was a "legal error" in its previous denial of the Leases. The purported "error" is premised on a new legal opinion (the "Jorjani M-Opinion"), which violates basic tenets of contractual interpretation and is inconsistent with the statutes and regulations governing the leases. In view of the new legal opinion, BLM revived the leases, ignoring the Forest Service's instruction that it did not consent to lease renewal due to the inherent risk of environmental damage to the BWCAW from sulfide mining.

4.     The Government's decision to resurrect the Leases is arbitrary, capricious, and contrary to law. The decision rests on an incorrect interpretation of the Leases, and is beyond the Government's authority to revisit an agency decision that the leases are expired that 16 months prior was made final.

## JURISDICTION AND VENUE

5.      This action arises under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-06, the Mandamus Act, 28 U.S.C. § 1361, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.

6.      This Court has subject matter jurisdiction over this Action and personal jurisdiction over Defendants under 28 U.S.C. § 1331, 28 U.S.C. § 1361, and 28 U.S.C. § 1346(a)(2).

7.      The APA provides a waiver of sovereign immunity as well as a cause of action. 5 U.S.C. § 702.

8.      This Court is a proper venue for this Action pursuant to 28 U.S.C. § 1391(e)(1)(A) and (B) because the Defendants are officers or employees of the United States or agencies thereof, acting in their official capacities, and such Defendants reside in this District and a substantial part of the events or omissions giving rise to the claims in this Complaint occurred in this District.

## THE PARTIES

### PLAINTIFF FRIENDS OF THE BOUNDARY WATERS WILDERNESS

9.      Since its formation in 1976, Plaintiff Friends of the Boundary Waters Wilderness ("Friends"), a nonprofit corporation, has pursued its mission "[t]o protect, preserve and restore the wilderness character of the Boundary Waters Canoe Area Wilderness and the Quetico-Superior Ecosystem."

10.      Friends' members have been harmed by the Government's decision to resurrect Twin Metals' mining leases. Among other injuries, members of Friends own

land nearby to the lands subject to the leases. Friends' members have heard Twin
Metals' exploratory drilling performed on the leased land. Friends' members have seen
the drill holes from exploratory sulfide-ore mining and have seen pollution caused by
these drill holes. Friends' members' property values have decreased, and they have
noticed a degradation in the water quality on their property. Further, Friends' members
also include academics who study BWCAW and surrounding ecosystem, and whose
professional endeavors have been impacted by Twin Metals' mining.

### HISTORY OF THE FRIENDS

11.    Friends was founded by Miron "Bud" Heinselman, a preeminent scientist
and researcher for the United States Forest Service. Under Heinselman's leadership,
Friends was the principal organization promoting passage of the 1978 Boundary Waters
Canoe Area Wilderness Act (U.S. Public Law 95-495), which increased the size of the
BWCAW to approximately 1.1 million acres and enshrined the BWCAW as a
statutorily-protected wilderness area.

12.    Friends has been involved in nearly every significant litigation involving
the BWCAW during the past 40 years. These include challenges to the 1978 Boundary
Waters Canoe Area Act, challenges to the United States Forest Service ("USFS") Forest
Management Plans for Superior National Forest, cases involving USFS timber sales
adjacent to the BWCAW, and other actions that would adversely impact the serene
wilderness character of the BWCAW and surrounding areas.

13.    Friends is organized under the laws of the State of Minnesota and has its
principal place of business in Minneapolis, MN. Friends has approximately 3,000

members nationwide, approximately half of whom reside in Minnesota. Those members use, enjoy, and benefit from the natural resources of the Superior National Forest, of which the BWCAW is a part.

FRIENDS' STANDING

14.     The APA affords a right of review to a person who is "adversely affected or aggrieved by agency action." 5 U.S.C. § 702. Twin Metals' exploratory mining on lands subject to the leases, and Defendants' improper reinstatement of the mining leases has adversely affected the Friends and its members by interfering with their use and enjoyment of the BWCAW and the Quetico-Superior ecosystem, as well as interfering with their use and enjoyment of their own property, nearby to the BWCAW and within the Quetico-Superior ecosystem.

15.     Members of the Friends regularly enjoy the lands nearby to the Leases—including the BWCAW and other lands in the Superior National Forest—and utilize them for recreational and professional purposes. For instance, members enjoy canoeing, wildlife viewing and study, photography, hiking, and fishing, as well as research and other activities that can be pursued in serene wilderness areas. Friends' members intend to continue to use and enjoy those areas in the future.

16.     Friends' members include individuals who own property on White Iron Lake and the South Kawishiwi River, which are within miles of, and immediately downstream of, the lands subject to the Leases, on which Twin Metals has performed exploratory mining. Friends' members have personally heard Twin Metals' exploratory

mining, which continued 24-hours a day, and could be heard even if windows were closed.

17.     As these members live close to the lands subject to the Leases, they have personally experienced how Twin Metals' mining activity has degraded the wilderness character of the ecosystem encompassing the BWCAW and surrounding areas. They have visited the areas subject to and nearby Twin Metals' leases and have plans to visit those areas again.

18.     Friends' members have experienced degradation of the water quality on their property since Twin Metals started exploratory mining on lands subject to the leases. Specifically, after Twin Metals commenced exploratory mining, she found sediment in the water never before encountered.

19.     Friends' members have personally seen the drill holes from exploratory mining, and describe the holes as clearly showing signs of pollution. The holes are described as having contained an oily film, and as having been smelly and discolored. Friends' members reported this pollution to the Minnesota Department of Natural Resources.

20.     Friends' members who own property near the lands subject to the leases have reported that the assessed value of their properties have dropped recently. Demand for property in the area around the land subject to the leases is driven by a desire for wilderness. Twin Metals' exploratory mining and the prospect of additional mining, both exploratory and full scale mining, have caused property values to fall.

21.     Friends' members have therefore experienced personal harm and harm to their property due to the effects of Twin Metals' exploratory mining and the prospect of additional mining by Twin Metals. Reinstatement of Twin Metals' leases will allow Twin Metals to continue and increase its mining activity in lands subject to the leases.

22.     Friends' members also include academics whose professional studies depend on the continued wilderness character of the ecosystem in the area of Twin Metals' mining leases and the ecosystem downstream, which includes the BWCAW. These include professors in the area of Behavioral Ecology, Natural Resource Policy, and Political Science.

23.     The professors have for decades taught in and visited the area around and downstream of Twin Metals leases. In the natural sciences, they have supervised the collection of datasets founded on the wilderness ecology of the lands subject to the leases, and areas downstream. These studies have been put at risk by Twin Metals' exploratory mining. Reinstatement of Twin Metals' leases will allow Twin Metals to continue and increase its mining activity in lands subject to the leases, thereby putting at risk research and datasets that rely on the wilderness character of the area.

24.     The professors—all members of Friends--study, as their career, the effects of light, sound, and increased traffic on wilderness areas. They have experienced firsthand the degradation of the wilderness that has already occurred from Twin Metals' exploratory mining, and they understand the effects of continued mining on the wilderness.

25.     Friends will continue to be harmed absent expiration of the Leases. Twin Metals has stated that its goal is "to submit a formal project proposal to state and federal agencies . . . within 18 months." *See* http://www.twin-metals.com/wp-content/uploads/2018/06/TMM-MineReader-MayJune_4.8x10.pdf. Twin Metals has planned additional drilling during the summer of 2018 as part of a study of water flow on the lands subject to the Leases. Thus, the harms to Friends is increasing.

**DEFENDANT BUREAU OF LAND MANAGEMENT**

26.     Defendant Bureau of Land Management ("BLM") is an agency of the Department of the Interior. BLM is an agency with responsibility over subsurface and mineral rights subject to the Leases. As such, BLM issued the two mining Leases that are the subject of this case, and adjudicated renewal applications for those Leases.

**DEFENDANT MITCH LEVERETT, IN HIS OFFICIAL CAPACITY AS BLM EASTERN STATES ACTING DIRECTOR**

27.     Defendant Mitch Leverett is BLM Eastern States Acting Director and is sued in his official capacity.

**DEFENDANT JOSEPH R. BALASH, IN HIS OFFICIAL CAPACITY AS ASSISTANT SECRETARY, LAND AND MINERAL MANAGEMENT, U.S. DEPARTMENT OF THE INTERIOR**

28.     Defendant Joseph R. Balash is the Assistant Secretary for Land and Mineral Management of the U.S. Department of the Interior and is sued in his official capacity.

**DEFENDANT DANIEL H. JORJANI IN HIS OFFICIAL CAPACITY AS PRINCIPAL DEPUTY**

**SOLICITOR FOR THE U.S. DEPARTMENT OF THE INTERIOR**

29.     Defendant Daniel H. Jorjani is the Principal Deputy Solicitor for the U.S. Department of the Interior and is sued in his official capacity.

**DEFENDANT U.S. DEPARTMENT OF THE INTERIOR**

30.     Defendant U.S. Department of the Interior is an executive department of the United States Government, responsible for the management of certain subsurface and mineral rights within the United States, including the lands subject to the Leases. Defendant BLM is an agency of the Department of the Interior.

**DEFENDANT RYAN ZINKE, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE U.S.**

**DEPARTMENT OF THE INTERIOR**

31.     Defendant Ryan Zinke is the Secretary of the U.S. Department of the Interior and is sued in his official capacity.

**DEFENDANT UNITED STATES OF AMERICA**

32.     Defendant United States of America is the federal government of the United States. Defendant U.S. Department of the Interior is a government department of the United States of America.

## BACKGROUND

33.     This Action involves the U.S. Government's improper decision to resurrect two expired mining leases on lands in Superior National Forest in northern Minnesota, on lands abutting and nearby the BWCAW. The Government's action has

the effect of benefitting a Chilean mining conglomerate, Antofagasta plc, to the harm of the people of the State of Minnesota and the United States, and their natural resources.

I.      **Background on the Boundary Water Canoe Area Wilderness (BWCAW) and Superior National Forest.**

   A.      **The BWCAW is a World-Renowned 1.1 Million Acres of Pristine Wilderness.**

   34.      The BWCAW is approximately 1.1 million acres of pristine wilderness land in the northern third of Superior National Forest in Minnesota, extending east-to-west along approximately 150 miles of international border with Canada. The BWCAW contains over 1,200 lakes interconnected by streams, rivers, and wetlands, and on land by hiking trails over rugged, rocky land through sub-boreal forests. The entirety of the BWCAW and Quetico Provincial Park to its north are roadless wilderness. The waterways are interconnected both on the surface and groundwater. The photograph below of an area within the BWCAW illustrates how the lakes, rivers, and streams interconnect.



*Photo credit: Jim Brandenberg, used with permission*

35.     The BWCAW is renowned for its high water quality. The BWCAW and surrounding Superior National Forest ecosystem contain approximately 20% of the fresh water supply in all United States national forests. The water in the BWCAW is interconnected not only on the surface, via streams and rivers that connect lakes, but also by groundwater flows. A typical picture of a waterway in the BWCAW's pristine wilderness is shown below:



*Photo credit: Greg Seitz, used with permission*

36.     The BWCAW and surrounding wilderness areas provide excellent and abundant habitat for thousands of species of wildlife, including over 100 species of migratory birds. The Superior National Forest has one of the largest populations of gray wolves outside of Alaska. The Superior National Forest is home to large populations of Minnesota icons—the moose and the common loon—as well as many game species like walleye, bass, and trout, and large populations of deer, grouse, and beaver. It is home to

rare species like the lake sturgeon, the great gray owl, and the black-backed woodpecker. The BWCAW is also home to three threatened or endangered species: the Canada lynx, the northern long-eared bat, and the gray wolf.

37.     As a result of its natural quality, the BWCAW and Superior National Forest are a natural laboratory for ecological study. The BWCAW has been a platform for research on soils, wildlife, biodiversity, and forest fires, among other areas. Stemming from its protected status, long-term datasets on changes to wildlife ecology have been gathered from the BWCAW and surrounding Superior National Forest ecosystem.

38.     The BWCAW contains approximately 1,500 cultural resource sites. These include historic villages of the Ojibwe, a native American tribe, and early French and British fur trade sites from prior to 1830, as well as numerous Native American pictographs. Cooper tool and stone tool sites have also been found, dating back to more than 3,000 years ago.

39.     The BWCAW offers exceptional wilderness experiences. These include long-distance canoeing, hiking, photography, fishing, dog sledding, and ice fishing. The BWCAW provides opportunities for solitude, wilderness, and ecological study, and personal growth that cannot be experienced elsewhere. The BWCAW is one of the country's most-visited wilderness areas: a 2007 U.S. Forest Service study recited that over 130,000 people visit the BWCAW each year. Dvorak, Robert G. et al., "The Boundary Waters Canoe Area Wilderness: Examining changes in use, users, and

management challenges," U.S. Department of Agriculture/Forest Service Research

Paper RMRS-RP-91 (March 2012).

40.     The BWCAW is among the most wild, untrammeled places in the United

States. The BWCAW is the largest wilderness area east of the Rocky Mountains and

north of the Everglades. *See Minnesota v. Block*, 660 F.2d 1240, 1247 (8th Cir. 1981). It has

been recognized by the National Geographic Society as one of "50 Places of a Lifetime"

in the entire planet—under the category "Paradise Found"—and the only one in the

Midwest. (*See National Geographic Traveler*, 50 Places of a Lifetime (1999).) In order to

preserve the wilderness character of the BWCAW, the USFS allows camping only on

designated campsites, limits the number of persons who can enter the BWCAW each

day.

41.     Visitors to the BWCAW may enter only at specific locations, called entry

points. Two of those entry points are within miles of Twin Metals' proposed mining

site.

42.     One highlight and historic part of the BWCAW is the so-called Voyageurs

Highway. This northern border of the BWCAW is a 120-mile canoe route, running along

the border between the BWCAW in the United States and Quetico Provincial Park in

Canada. This water-borne path was used extensively by Native Americans and

European fur traders, and is now enjoyed by visitors to the BWCAW.

43.     The BWCAW is part of an international network of protected conservation

land and wilderness. Quetico Provincial Park, to the immediate north of the BWCAW in

Ontario, Canada, is an internationally renowned wilderness park, providing another

2,000 lakes of pristine quality and over one million acres of remote wilderness. To the northwest of the BWCAW, Congress established Voyageurs National Park in 1971. Voyageurs National Park encompasses approximately 237,000 acres, 30 lakes, and about 900 islands, all interconnected by waterways. Voyageurs National Park extends approximately 55 miles along the United States-Canada border in Minnesota.

44.     As explained below, a large part of the BWCAW and Quetico Provincial Park, as well as all of Voyageurs National Park, are downstream and in the same watershed—the Rainy River watershed—as Twin Metals' proposed mining sites.

### 1.     Watersheds in the BWCAW.

45.     Waterflow in the BWCAW is divided among three major watersheds. A geological formation called the Laurentian Divide runs southwest to northeast in the eastern part of the BWCAW and divides the three watersheds.

46.     South of the Laurentian Divide, the Laurentian System watershed flows east towards the Atlantic Ocean through the Great Lakes, and the Mississippian System watershed flows south and west into the Gulf of Mexico via the Mississippi River. North of the Laurentian Divide, water flows north to Hudson Bay. Large parts of the BWCAW and Quetico Provincial Park, and all of Voyageurs National Park are north of the Laurentian Divide, and are in the Rainy River watershed.

### 2.     The Leased Land Is In the Rainy River Watershed, Which Flows Through the BWCAW, Quetico Provincial Park, and Voyageurs National Park.

47.     The lands that are the subject of Twin Metals' mining leases in this Action are in the Rainy River watershed. Specifically, those lands are within the South

Kawishiwi River sub-watershed and the Birch Lake sub-watershed, both of which are catchments (sub-parts) of the Rainy River watershed. Water flows from the northern lease flows into the South Kawishiwi River, which flows into Birch Lake. Water from the southern lease flows also flows into Birch Lake. Birch Lake empties into the main Kawishiwi River and then into the BWCAW within the Rainy River watershed.

48.     In the Rainy River watershed, water generally flows to the north and west, through international border lakes within the BWCAW and Quetico Provincial Park, like Basswood Lake. The watershed then flows through Rainy Lake, in Voyageurs National Park, and into the Rainy River, which ultimately flows north into Hudson Bay.

49.     Consequently, any drainage from Twin Metals' mining activity on those lands flows into the BWCAW, Quetico Provincial Park, and Voyageurs National Park.

**B.     Legal Protections for the BWCAW.**

50.     More than a century ago, in 1926, the Department of Agriculture set aside part of the land that is now the BWCAW as a primitive roadless area to protect its wilderness character. The land that is now the BWCAW has been protected from development since that time. In 1938, the Federal Government established the Superior Roadless Primitive Area, which had boundaries very similar to the modern BWCAW.

51.     In 1964, Congress passed the Wilderness Act, which declared "the policy of the Congress to secure for the American people of present and future generations the benefits of an enduring resource of wilderness." 16 U.S.C. § 1131(a). The Wilderness Act specifically identified the land now inside the BWCAW as being set aside for protection as part of the National Wilderness Preservation System.

15

52.     Forty years ago, Congress passed the Boundary Waters Canoe Area Wilderness Act into law. Pub. L. 95-495, 92 Stat. 1649 (1978). Congress found it "necessary and desirable to provide for the protection, enhancement, and preservation of the natural values of the lakes, waterways, and associated forested areas known (before the date of enactment of this Act) as the Boundary Waters Canoe Area." Pub. L. 95-295, Sec. 1. The 1978 BWCAW Act not only expanded the protected area to the approximately 1.1 million acres protected today as the BWCAW, it also specifically established a separate Boundary Waters Canoe Area Mining Protection Area outside of the BWCAW to provide additional protections for the natural value and high environmental quality of the surrounding area against mining. Congress expressed that one of the purposes of the 1978 BWCAW Act was to "minimize to the maximum extent possible, the environmental impacts associated with mineral development affecting such areas. . . ." Pub. L. 95-465, Sec. 2(4).

**C.     Twin Metals' Mining Project on Land Adjacent to and Upstream of the BWCAW.**

53.     Twin Metals has proposed to mine copper, nickel, and other heavy metals from a type of rock called sulfide-ore. *See* http://www.twin-metals.com/about-the-project/ (last visited June 10, 2018) (describing that Twin Metals' planned proposal design includes "[p]rocessing approximately 20,000 tons of mineralized ore per day using underground mining operations" and operating a 100-acre processing site). Twin Metals' proposed mine includes an underground mine and tunnel to a large processing facility, and well as a tailings pond and waste area. *Id.* Accumulated tailings—crushed

up sulfide-ore bearing rock--would be stored in part underground in the mine and in part above ground in a tailings pond. *Id.* The ore which Twin Metals desires to mine contains only a small amount of ore. As a result, large amounts of crushed sulfide-ore would remain exposed for long periods of time to water and air.

54.     Twin Metals' proposed mining site and processing plant are within miles of two entry points to the BWCAW. Entry point 32-South Kawishiwi River, and entry point 33-Little Gabbro Lake, are just 3 miles northwest of Twin Metals' proposed mining site, and are within the drainage basin on the proposed mine.

## II.     Twin Metals' Now-Expired Mining Leases.

### A.     Predecessors-in-Interest to Twin Metals Are Granted Two Mineral Leases in 1966.

55.     In 1966, the predecessor-in-interest of Twin Metals, International Nickel Company, Inc. ("INCO"), was granted two preference right mineral leases (the "Leases") on lands that are within miles of the BWCAW, and within the Rainy River watershed. Some land plots subject to the Leases are adjacent to the BWCAW. The preference right mineral leases are numbers MNES-01352 and MNES-01353.

### 1.   The Leased Land Is Adjacent to and Within Miles of the BWCAW, and Groundwater from the Leased Land Flows Into the BWCAW.

56.     The lands covered by the Leases are, on information and belief, shown in the maps below maps. The lands covered by the Leases are shown in both maps as the highlighted green and brown areas. A blowout of the top right corner first map below is shown in the second map below.





57.     The above maps identify the lands subject to Lease MNES-01353 as being

immediately adjacent to the BWCAW. MNES-01353 lies immediately southwest of

Boundary Waters Entry Point 32 (South Kawishiwi River) and Entry Point 33 (Little

Gabbro Lake). MNES-01352 is three miles southwest of those entry points, on the

eastern and western shores of Birch Lake, and also along the south side of the South

Kawishiwi River.

58.     Water in the leased area drains into the BWCAW. From the lands subject to the Leases, water flows north and west within catchments of the Rainy River watershed and into the BWCAW, through Birch Lake, White Iron Lake, and the Kawishiwi River and into the BWCAW. Lakes in the BWCAW including Gabbro Lake and Little Gabbro Lake, Fall Lake, and northward through Basswood Lake are within the flowage. Those waters then flow northward into Quetico Provincial Park and westward into Voyageurs National Park.

59.     The lands subject to Twin Metals' mining Leases are within the ecosystem of the BWCAW, Quetico Provincial Park, and Superior National Forest.

60.     After the Government reinstated Twin Metals' Leases, a reinvigorated Twin Metals announced plans to move the processing plant for its planned sulfide-mine even closer to the BWCAW. Specifically, on May 25, 2018, Twin Metals announced that its proposed ore processing plant would be located on the east bank of Birch Lake, approximately 0.4 miles from the lakeshore, and closer to the BWCAW. As described herein, Birch Lake flows directly into the BWCAW. Public outcry was immediate, and focused on the increased risk to the ecology of the BWCAW. *See, e.g.*, "Twin Metals wants to build ore processor closer to BWCA," ASSOCIATED PRESS, reprinted in STAR TRIBUNE, May 25, 2018.

//

//

//

2. **The Statutes and Regulations Governing the Leases Require BLM to Consider the Environmental Value of the Land and the Land's Wilderness Character.**

61. The lands subject to the Leases are in part acquired Weeks Act lands and in part National Forest Service lands reserved from the public domain and managed by the United States Forest Service.

62. As to Weeks Act lands, the Secretary of the Interior's authority, delegated to BLM, to issue leases on acquired Weeks Act lands is governed by 16 U.S.C. § 520, which allows mineral development on such lands to be authorized by the Secretary only when he is advised by the Secretary of Agriculture that such development will not interfere with the primary purposes for which the land was acquired and in accordance with the best interests of the United States. *See* Sec. 402 of Reorganization Plan No. 3 of 1946, 60 Stat. 1097, 1099-1100. This section of the Reorganization Plan transfers the leasing functions of the Secretary of Agriculture under § 520 to the Secretary of the Interior, but allows the Secretary of the Interior to authorize mineral activity only if the Secretary of Agriculture determines that the use will not interfere with the primary purposes for which the land was acquired. Under the Weeks Act, 16 U.S.C. § 515, Weeks Act Lands are purchased by the Secretary of Agriculture, for the purposes of "regulation of the flow of navigable streams or for the production of timber." In assessing the best interests of the United States, as the current delegate agency of the Secretary of the Interior, BLM is to consider the environmental impact before granting a lease under Section 402 of Reorganization Plan No. 3 of 1946. 43 C.F.R. § 3507.19(b).

63. As to reserved lands in Superior National Forest, the Secretary of the Interior's authority, delegated to BLM, to issue leases on reserved lands in Superior National Forest is governed by 16 U.S.C. § 508(b), which is titled "National forests in Minnesota; authority to prospect, develop, mine, remove, and utilize mineral resources." Section 508(b) provides, in part, that:

> Where . . . the Secretary of the Interior is authorized, under general regulations to be prescribed by him and upon such terms and for specified periods or otherwise as he may deem to be for the best interests of the United States, to permit the prospecting for and the development and utilization of such mineral resources:
>
> Provided, *That the development and utilization of such mineral deposits shall not be permitted by the Secretary of the Interior except with the consent of the Secretary of Agriculture.*

(emphasis added).

64. The Federal Land Management and Policy Act ("FLPMA") requires that BLM "manage the public lands under principles of multiple use and sustained yield," and "take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732. This requires BLM to consider the risk to environmental and wilderness resources in wilderness lands such as the BWCAW. 43 C.F.R. § 3507.19(b).

65. Under the foregoing statutes, 16 U.S.C. § 508b, 16 U.S.C. § 520, Section 402 of Reorganization Plan No. 3 of 1946, and FLPMA (collectively, "the Leasing Statutes") BLM is required to take account of the environmental and wilderness values on public lands in and around the Leases, including the BWCAW, in exercising its discretion with respect to the Leases. Among other provisions, under BLM regulations governing Weeks Act lands, BLM is to consider "the land use plan" and "[a]ny environmental

impacts" before renewing a hardrock mining lease. 43 C.F.R. § 3507.19(b). The authorizing statute for Superior National Forest mining requires the Department of the Interior to consider the "best interests of the United States" and further requires the Department of the Agriculture—here its surface management agency, the United States Forest Service—to consent before leasing. Under the FLPMA, BLM is required to "take action" to "prevent unnecessary or undue degradation of the land." 43 U.S.C. § 1732.

66.     Making the Congressional intent even more clear, Congress enshrined protection for the BWCAW in the Wilderness Act of 1966 and the Boundary Waters Canoe Area Wilderness Act of 1978. As set out in the statute, one of the purposes of the Boundary Waters Canoe Area Wilderness Act of 1978 is to "minimize to the maximum extent possible, the environmental impacts associated with mineral development affecting such areas. . . ." Pub. L. 95-465, Sec. 2(4).

### 3.     The Renewal Terms of the 1966 Leases.

67.     The 1966 Leases provided a 20-year initial term, with the possibility of three individual, successive renewals. One portion of the paragraph titled "Renewal Terms" provides in part as follows:

> The Lessor shall have the right . . . to readjust other terms and conditions of the lease, including the revision of or imposition of stipulations for the protection of the surface of the land as may be required by the agency having jurisdiction thereover; provided, however the Lessee shall have the right to three successive ten-year renewals of this lease with any readjustment in the royalties payable hereunder limited to that hereinafter provided and with no readjustment of any of the other terms and conditions of this lease *unless at the end of the primary term of this lease the Lessee shall not have begun production, either hereunder or under the companion lease granted to the Lessee this day.*

(emphasis added).

68.     Under this provision, there is no right to renewal unless the lessee has

started production during the initial 20-year term or any extensions granted by BLM.

69.     During the primary 20-year term of the lease (1966 to 1986), production

was not started on either MNES-01352 or MNES-01353.

70.     As of the filing of this Complaint, neither Twin Metals nor its predecessors

have begun production on either MNES-01352 or MNES-01353.

**B.      Predecessors-in-Interest to Twin Metals Were Granted Two 10-year Renewals in 1986 and 2004, and Renewal Leases Issued in 2004.**

71.     In 1986, a predecessor-in-interest of Twin Metals applied for a 10-year

renewal of the Lease, which was granted by BLM in 1989. Prior to issuance of the 1989

Lease renewals, BLM requested that the U.S. Forest Service consent to the lease renewal.

The USFS consented.

72.     In 1999, another predecessor-in-interest of Twin Metals applied for a

second renewal of the Leases, which was granted by BLM to be effective on January 1,

2004. Prior to issuance of the 2004 renewal Leases, BLM requested and obtained the

consent of the USFS to the renewal. The USFS consented.

73.     The 2004 renewal Leases state that they are "for a period of 10 years . . .

with preferential right in the lessee to renew for successive periods of 10 years under

such terms and conditions as may be prescribed by the Secretary of the Interior, unless

otherwise provided by law at the expiration of any period."

**C.**    **In 2012, Twin Metals Applied for a 10-Year Lease Renewal, Which Was Denied Because BLM Determined Twin Metals Had No Right to a Third Renewal as of Right, and the Forest Service Denied Consent to Renewal Due to the Danger of Sulfide-Ore Mining to the BWCAW.**

74.    On information and belief, in 2013, the Leases were assigned to Franconia Minerals (US) LLC. On information and belief, Twin Metals Minnesota is the parent company of Franconia Minerals (US) LLC. A large Chilean mining conglomerate, Antofagasta plc, is the whole owner of Twin Metals Minnesota and controls and directs the activities of Twin Metals Minnesota and Franconia Minerals (US) LLC.

75.    In October 2012, a predecessor-in-interest to Twin Metals applied for a ten-year renewal of the Leases. The application sought to renew the 2004 renewal Leases.

**1.**    **In March 2016, the Solicitor of the Department of the Interior Concluded that BLM Has Discretion to Grant or Deny Twin Metals' Lease Renewal Application.**

76.    After receiving the 2012 renewal application, BLM sought a legal opinion as to whether BLM has discretion to grant or deny Twin Metals' renewal application.

77.    On March 8, 2016, the Solicitor of the Department of the Interior delivered its legal opinion. In a detailed and exhaustive 13-page, single-spaced opinion, Solicitor Hillary M. Tompkins examined the terms of the 2004 renewal Leases, and addressed the import, if any of the terms of the 1966 Leases.

78.    Solicitor Tompkins found that "[a]t this time, the 2004 renewal leases are in effect, and they use BLM's standard renewal language that has been in place since the 1980s. In particular, the 2004 lease renewal terms grant the 'preferential right in the

lessee to renew for successive periods of ten years under such terms and conditions as may be prescribed by the Secretary of the Interior, unless otherwise provided by law at the expiration of any period.'"

79.     Continued the Solicitor, the "*preferential* right of renewal does not *entitle* the lessee to renewal of the lease but 'gives the renewal lease applicant the legal right to be preferred against other parties, should the Secretary, in the exercise of his discretion, decide to continue leasing." (Emphasis in original.)

80.     The Solicitor concluded that the "2004 leases are each complete, integrated documents that contain all necessary lease terms and are duly signed by the lessee and lessor." However, even if the 1966 Leases were to govern, those Leases also give BLM discretion as to whether to renew the Leases. (*Id.*)

81.     Thus, Solicitor Tompkins concluded that

the lessee has not established a non-discretionary right to a third ten-year renewal. Under the governing 2004 lease terms, the BLM has the same discretion regarding whether to renew the lease for a third time as it had in determining whether to grant the initial lease. While the 2004 lease terms give the lessee a preference over other potential lessees to lease the lands in question, they do not entitle the lessee to non-discretionary renewal of the leases.

(Tompkins M-Opinion at 13.)

82.     Twin Metals filed suit in the United States District Court for the District of Minnesota challenging the Tompkins M-Opinion on September 12, 2016, in the case captioned *Franconia Minerals (US) LLC and Twin Metals Minnesota LLC v. United States of America*, No. 0:16-cv-03042-SRN-LIB (D. Minn.).

2.      **BLM Requested USFS Consent to Renew the Leases, and the USFS Issues a Well-reasoned Decision That It Did Not Consent to the Renewal.**

83.     In accordance with the Tompkins M-Opinion, and as it had done in considering the 1989 Lease renewal and 2004 Lease renewal, BLM requested on June 13, 2016, that the USFS provide a decision whether it consents to a third renewal of the two Twin Metals' Leases. BLM made this request to the USFS because the USFS is the agency with supervisory jurisdiction over surface rights and surface management of the lands that are the subject of the Leases.

84.     BLM's request for consent from the USFS prior to renewal of the Twin Metals' Leases was consistent with the Leasing Statutes, including the statutory directives of 16 U.S.C. § 520 and also 16 U.S.C. § 508(b), which provides that the "development and utilization of such mineral deposits shall not be permitted by the Secretary of the Interior except with the consent of the Secretary of Agriculture." 16 U.S.C. § 508(b). The request for consent of the USFS was also consistent with the terms of the Leases.

85.     After a public-input period, the USFS issued its decision on December 14, 2016. Among other aspects, the USFS considered the economic impact of the Twin Metals mines on lands subject to the Leases, balanced against the risk of that mining to the surface lands, and the wilderness value of the BWCAW and Superior National Forest absent mining. The USFS also considered its statutory and regulatory role with respect to hardrock mineral leases.

86.     The USFS found that the BWCAW is uniquely susceptible to the hazards of hardrock mining like that proposed by Twin Metals. Specifically, the USFS found that "[b]oth the Minnesota Pollution Control Agency and the Environmental Protection Agency (EPA) have identified the surface waters of northeastern Minnesota as sensitive to changes in pH, acid deposition, and acid runoff."

87.     The USFS also found that one "risk of mining development is acid mine drainage (AMD)." The USFS explained that "AMD generally occurs when sulfide minerals present in ore bodies and rock overburden are exposed to air and water." This exposure creates sulfuric acid, "which subsequently increases water pH and leaches harmful metals such as copper, zinc, lead, cadmium, iron, and nickel." Wrote the USFS, the danger of AMD is "dramatically increased by the generation of any mining product (stockpiles, overburden, and tailings) exposed to air, and continue for decades."

88.     There is a direct flow of water from the lands subject to Twin Metals' leases to the BWCAW. Further, "mining facilities and byproducts [in TMM's leases] can produce significant amounts of acid," wrote the USFS.

89.     The USFS also noted that Twin Metals' mine would include roads, rail lines, power transmission lines, natural gas pipelines, tailings and concentrate pipelines, and water pipelines. All of these would be within the watershed draining towards the BWCAW.

90.     The USFS found that the extreme weather and remoteness of the BWCAW and Superior National Forest region cautioned whether the risk of a severe accident or failure could be adequately limited. The USFS noted that many operating United States

copper mines are in the drier areas, such as the southwest. Mining of copper-nickel sulfide ore such as that proposed by Twin Metals is untested in Minnesota, an area known for strong storms and frigid winters with significant snowfalls.

91.    The USFS also reviewed water quality impacts from 14 operating U.S. copper sulfide mines. The USFS found that

> 100% of the mines experienced pipeline spills or accidental releases; 13 of the 14 mines' water collection and treatment systems failed to control contaminated mine seepage resulting in significant water quality impacts; tailings spills occurred at 9 operations; and a partial failure of tailing impoundments occurred at 4 mines.

92.    The USFS found that Twin Metals' proposed mine would directly impact fish populations and aquatic ecosystems. In addition, Twin Metals' proposed mine would also impact the three threatened species within the BWCAW and Superior National Forest, the Canada Lynx, northern long-eared bat, and the gray wolf.

93.    The USFS also considered the social and economic considerations of Twin Metals proposed mine. These included the economic impact of Twin Metals mine as well as the detrimental economic impact on businesses that depend on the BWCAW, such as outfitters and guide businesses.

94.    After months of study, the USFS concluded as follows:

> Balancing what are primarily economic benefits of the mining operations that TMM [Twin Metals] hopes to conduct in connection with the renewal of its two leases against even a remote possibility of damaging the BWCAW—a unique ecosystem that Minnesota elected officials have fittingly called irreplaceable and a national treasure—makes it clear that it is incumbent upon the FS to withhold consent to the renewal of TMM's leases MNES-01352 and MNES-01353.

95.     Concurrent with and consistent with its decision to not consent to renewal of the Twin Metals mining Leases, the USFS proposed a 20-year withdrawal of federally-owned lands within the Rainy River watershed from future mining Leases.

**3.     In December 2016, BLM Denied Twin Metals' Lease Renewal Applications.**

96.     Relying on the December 14, 2016 USFS decision, BLM denied Twin Metals' application to renew the 2004 renewal Leases on December 15, 2016.

97.     When BLM denied renewal of the Twin Metals' renewal application, the Twin Metals mining Leases MNES-01352 and MNES-01353 expired. Twin Metals was provided notice by BLM of its decision to deny renewal of the Leases.

98.     Following the BLM's denial of its Lease renewal application, in the case it filed in the United States District Court for the District of Minnesota, Twin Metals amended its complaint to also challenge BLM's Lease renewal denial. *See Franconia Minerals (US) LLC et al. v. United States of America*, 0:16-cv-03042-SRN-LIB, dkt. 72 (Feb. 21, 2017 D. Minn.).

**D.     Sixteen Months After Denying Twin Metals' Renewal Application, BLM Reverses Course, Reinstates the Leases, and Reopens Twin Metals' Lease Renewal Application.**

99.     In 2017, BLM obtained a new M-Opinion reversing the Tompkins M-Opinion. Under the guise of a purported legal error, BLM reversed the December 15, 2016 decision denying renewal, reinstated Twin Metals' Leases, and reopened Twin Metals' Lease renewal application.

1.     **Twenty-two Months After the Tompkins M-Opinion, and 12 Months After the Lease Application Is Denied, the Principal Deputy Solicitor of the Department of the Interior Issues a Reversal—a New M-Opinion Concluding that the Government Has No Discretion But to Grant Twin Metals' Lease Renewal.**

100.    On December 22, 2017, 22 months after the Tompkins M-Opinion, Daniel H. Jorjani, in his capacity as the Principal Deputy Solicitor of the Department of the Interior, issued a legal opinion reversing the same department's well-reasoned Tompkins M-Opinion. The Jorjani M-Opinion concluded that "M-37037 [the Tompkins M-Opinion] improperly interpreted the leases and is withdrawn. . . . Accordingly, BLM does not have the discretion to deny the renewal application."

101.    The same day the Interior Department and BLM published the Jorjani M-Opinion, Twin Metals dismissed the case it filed in the United States District Court for the District of Minnesota. *See Franconia Minerals (US) LLC et al. v. United States of America*, No. 0:16-cv-03042-SRN-LIB, Dkt. 130 (D. Minn. Dec. 22, 2017).

102.    The Jorjani M-Opinion is incorrect as a matter of law. For example, the Leases do not allow for a renewal as of right, they only grant a "preferential right . . . to renew." The Jorjani M-Opinion incorrectly considers extrinsic evidence in violation of fundamental tenets of contract interpretation. Further, the Jorjani M-Opinion relies on a tortured reading of the 1966 Leases that is inconsistent with the contractual language of those Leases. Even if the 1966 Leases are to be considered, Twin Metals would not have a right to a third successive renewal unless it started production during the initial 20 year term, from 1966-1986, which did not occur.

103.    The Jorjani M-Opinion is also incorrect as a matter of law because it

interprets a contract between the U.S. Government and Twin Metals inconsistent with

the Leasing Statutes that address the Government's authority over mineral leases. For

instance, 16 U.S.C. § 508(b) requires consent of the surface management agency prior to

"development and utilization" of mineral resources. It further would result in a waiver

of BLM's statutory authority under the FLPMA to "take any action necessary to prevent

unnecessary or undue degradation of the lands." 43 U.S.C. § 1732. It further is violative

of BLM's direction under that statute to "manage the public lands under principles of

multiple use and sustained yield." *Id.* It further constrains BLM's ability to account for

the "best interests of the United States" as it must in deciding whether to allow mining

on acquired Weeks Act lands. 16 U.S.C. § 520.

104.    The Jorjani M-Opinion is also incorrect as a matter of law because it

attempts to allow for the resurrection of the Renewal Leases even though the Leases

had been previously allowed to expire by their express terms.

### 2.    In Reliance on the Jorjani M-Opinion, the Department of the Interior Resurrects Twin Metals' Expired Leases.

105.    In reliance on the Jorjani M-Opinion, on May 2, 2018, BLM reinstated

Twin Metals' mineral Leases MNES-01352 and MNES-01353 (the

"May 2, 2018 Rescind/Reinstatement Decision"). In the May 2, 2018

Rescind/Reinstatement Decision, BLM vacated the December 15, 2016 renewal rejection

decision, and reinstated and resuscitated the Leases. This action occurred more than 16

months after BLM rejected Twin Metals' lease renewal application, which had caused

the Leases to expire.

106.    BLM based its May 2, 2018 Rescind/Reinstatement Decision on a

purported legal error that the government had discretion to deny lease renewal. The

May 2, 2018 Rescind/Reinstatement Decision is signed by Mitchell Leverette, as BLM

Acting State Director, Eastern States. Joseph R. Balash, Assistant Secretary of Land and

Minerals Management for the U.S. Department of the Interior signed the May 2, 2018

Rescind/Reinstatement Decision to indicate his concurrence in the decision, and stated

that the decision is a "Final Decision of the Agency" not subject to administrative

appeal.

107.    Prior to reinstatement of the Leases, and contrary to the Leasing Statutes

governing the authority of the Interior Department to issue leases for mineral

development, BLM did not seek consent or input of the surface management agency.

Rather, the May 2, 2018 Rescind/Reinstatement Decision reports that it "informed the

Forest Service that its December 2016 non-consent determination was not legally

operative" and that the "Forest Service has not objected to that conclusion."

108.    BLM disregarded as "not legally operative" the USFS's non-consent

determination dated December 14, 2016, which concluded that hardrock mining by

Twin Metals would result in grave risks and immediate harm to the ecology of Superior

National Forest, the BWCAW, and the Rainy River watershed.

109.    BLM lacked express and inherent authority to issue its May 2, 2018

Rescind/Reinstatement Decision. BLM had no express or inherent authority to issue a

decision on Twin Metals' Leases reversing BLM's prior decision that the Twin Metals

Leases should not be renewed and should be expired.

## CAUSE OF ACTION I:

### VIOLATION OF THE ADMINISTRATIVE PROCEDURES ACT BY THE MAY 2, 2018 BLM FINAL AGENCY RESCIND/REINSTATEMENT DECISION BECAUSE BLM LACKED AUTHORITY TO RESCIND THE LEASE APPLICATION DENIAL AND RESURRECT AND RESUSCITATE THE EXPIRED LEASES

110.    The allegations in paragraph 1 - 107 are incorporated by reference.

111.    Under the APA, 5 U.S.C. § 701 et seq., an entity "suffering legal wrong

because of agency action, or adversely affected or aggrieved by agency action within the

meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

112.    The May 2, 2018 Rescind/Reinstatement Decision is a final agency action

within the ambit of 5 U.S.C. § 704.

113.    The APA, 5 U.S.C. § 701 et seq., prohibits Defendants from acting in a

manner that is in excess of statutory jurisdiction, authority, or limitations, or short of

statutory right. 5 U.S.C. § 706(2)(C). Further, under 5 U.S.C. § 706, this Court is

empowered to hold unlawful and set aside agency action, findings, and conclusions

that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law."

114.    The Leases expired when Twin Metals received BLM's December 15, 2016

decision.

115.    BLM had no express or inherent authority to rescind its December 15, 2016

decision, or to resurrect and reinstate the expired Leases. Further, BLM's May 2, 2018

Rescind/Reinstatement Decision is violative of BLM's and USFS's obligations under the Leasing Statutes. As such, its action should be held unlawful and set aside under the APA, 5 U.S.C. § 706(2).

116.    Friends is harmed by the agency's action rescinding the Lease application denial, and its resurrection and reinstatement of the Leases.

## CAUSE OF ACTION II:

### VIOLATION OF THE ADMINISTRATIVE PROCEDURES ACT BY THE JORJANI M-OPINION

117.    The allegations in paragraph 1 - 114 are incorporated by reference.

118.    Under the APA, 5 U.S.C. § 701 et seq., an entity "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

119.    The Jorjani M-Opinion is an intermediate agency action subject to review on the review of the final agency action. 5 U.S.C. § 704. The May 2, 2018 Rescind/Reinstatement Decision is a final agency action within the ambit of 5 U.S.C. § 704.

120.    Under 5 U.S.C. § 706, this Court is empowered to hold unlawful and set aside agency action, findings, and conclusions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." The Jorjani M-Opinion interpreting the Leases is a matter subject to this Court's review.

121.    The 2004 renewal Leases are fully integrated contracts. There is no ambiguity in their renewal terms. As preference right leases, they preserve BLM's authority to deny renewal. BLM's 2016 denial of renewal of the 2004 renewal Leases

was authorized by the 2004 Leases. The 2004 renewal Leases required the consent of the USFS prior to renewal, which the USFS refused.

122.    BLM's May 2, 2018 Rescind/Resinstatement Decision is based on an incorrect interpretation of the Leases as set out in the Jorjani M-Opinion. The Jorjani M-Opinion is arbitrary, capricious, and contrary to law, in part because it defies basic tenets of contract interpretation.

123.    Contrary to the Jorjani M-Opinion, the 2004 renewal Leases are preference right leases that to not entitle Twin Metals to any renewal. Further, even if extrinsic evidence may be considered in construing the 2004 renewal Leases, the 1966 Leases do not permit a third renewal as of right, because no production was initiated during the initial 20-year term of the 1966 Leases.

124.    The Jorjani M-Opinion further is inconsistent with the statutory and regulatory framework protecting the BWCAW and other lands downstream of the lands subject to the Leases.

125.    Friends is harmed by the reversal in interpretation of the Leases set forth in the Jorjani M-Opinion. The incorrect legal interpretation of the Jorjani M-Opinion prompted BLM to unlawfully resuscitate Twin Metals' Leases, contrary to federal statutes and regulations governing mineral development and the protection of public lands and wilderness in the Superior National Forest and BWCAW that protect Plaintiff's interests.

### CAUSE OF ACTION III:

#### DECLARATORY JUDGMENT OF LEASE EXPIRATION

126.    The allegations in paragraphs 1 - 123 are incorporated by reference.

127.    The Declaratory Judgment Act, 28 U.S.C. § 2201 et seq. empowers this Court to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

128.    Friends seeks relief that the Government's action to reinstate Twin Metals' Leases in BLM's May 2, 2018 Rescind/Resinstatement Decision was arbitrary, capricious, and contrary to law and beyond BLM's express and inherent authority. Vacating the May 2, 2018 Rescind/Reinstatement Decision would have the effect of reverting to the status quo prior to the May 2, 2018 Rescind/Reinstatement Decision, according to which the Twin Metals' Leases are expired according to their terms.

129.    Accordingly, Friends requests that this Court declare that Twin Metals' Leases are expired, null, and void, according to their terms.

#### REQUEST FOR RELIEF

Wherefore, for the foregoing reasons, Friends of the Boundary Waters Wilderness respectfully requests that the Court:

A.    Vacate BLM's May 2, 2018 Rescind/Reinstatement Decision as arbitrary, capricious, and contrary to law and beyond BLM's express and inherent authority and limitations thereon;

B.    Declare that the Defendants have violated the Leasing Statutes by arbitrarily adopting an erroneous interpretation of the Leases that would

constrain BLM and the USFS from fulfilling their statutory obligations with respect to the Leases, the land subject to the Leases, the BWCAW, Superior National Forest, and the surrounding ecosystem;

C.     Vacate the Jorjani M-Opinion as arbitrary, capricious, and contrary to law;

D.     Declare that Twin Metals' Leases are expired, null, and void according to their terms;

E.     Grant preliminary and permanent injunctive relief barring Twin Metals from performing further exploratory mining or other mining on the lands subject to the Leases;

F.     Award Plaintiff its costs and expenses of this Action, including reasonable attorneys' fees, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

G.     Grant further legal or equitable relief as this Court may deem just and equitable.

DATED:  June 25, 2018              **ROBINS KAPLAN LLP**

By:  /s/ Meegan F. Hollywood

Richard B. Allyn (MN # 0001338) (pro hac vice pending)
Stephen P. Safranski (MN #0331326) (pro hac vice pending)
Ari B. Lukoff (MN #0390025) (pro hac vice pending)

2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN  55402-2015

38

Tel.: (612)349-8500
Fax: (612)339-4181
*RAllyn@robinskaplan.com*
*SSafranski@robinskaplan.com*
*ALukoff@robinskaplan.com*

Meegan F. Hollywood
(Dist. D.C. Bar No. NY0206)

399 Park Avenue
Suite 3600
New York, NY 10022
Tel.: (212)980-7400
Fax: (212)980-7499
*MHollywood@robinskaplan.com*

*Attorneys for Plaintiff*
*Friends of the Boundary Waters Wilderness*

88784280.3